UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

RANDY L. BAAB,

                    Plaintiff,

        vs.

HARRIS CORPORATION and
EXCELIS, INC.,[1]

                    Defendants.

CIV. NO. 17-00011 DKW-RLP

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT

Baab asserts claims for disability and age discrimination, intentional

infliction of emotional distress, and retaliation against Harris and Exelis, his former

employers.[2] Following the filing of Defendants' Motion for Summary Judgment

("MSJ"; Dkt. No. 31), Baab conceded all but his disability discrimination claims.

Baab's disability claims also fail, however, because Baab was unable to perform

the essential functions of his Fire Fighter position and is unable to state a prima

---

[1]Excelis is apparently misidentified in the Complaint, and is hereinafter referred to by its proper name, Exelis. *See e.g.* Parker Decl. ¶ 2, Dkt. No. 32-5.

[2]Exelis was created on October 31, 2011, when ITT Corporation "spun off its defense business, including the firefighting operations at the [Pacific Missile Range Facility]." Baab's employment transferred from ITT to Exelis at that time. Parker Decl. ¶ 2, Dkt. No. 32-5. Exelis, which had been a "wholly-owned subsidiary of Harris Corporation" since May 29, 2015, was dissolved on January 1, 2016. Parker Decl. ¶ 3, Dkt. No. 32-5. "After Exelis's dissolution, Harris assumed Exelis's contract to provide firefighting services" at the facility. Parker Decl. ¶ 3, Dkt. No. 32-5.

facie claim.  Accordingly, as explained below, Defendants' summary judgment motion is GRANTED.

## BACKGROUND

Baab worked for Harris/Exelis (collectively, "H/E") from September 1993 until his termination on December 11, 2015.  Compl. ¶¶ 4, 5, Dkt. No. 1.  Hired as a Fire Fighter at the Pacific Missile Range Facility at Barking Sands in Kekaha, Hawaii ("PMRF"), Baab was promoted to "Lieutenant/Crew Chief" on February 9, 2011 (Broyles Decl. ¶ 2, Dkt No. 32-3) and held that position until he was demoted in August 2015, a few months prior to his termination (Baab Decl., Ex. 6 [Kuapahi Mem. (8/10/15)], Dkt. No. 41-7).  *See* Compl. ¶ 16, Dkt. No. 1.

While employed as a Crew Chief, Baab alleges that he developed a disability, for which he requested a reasonable accommodation.  Specifically, Dr. Dennis Scheppers, M.D., diagnosed Baab—then 59-years old—with "[a]nxiety as acute reaction to exceptional stress" on February 25, 2015.  Baab Decl., Ex. 7 [Worker's Comp. Claim (2/27/15)] at 3, Dkt. No. 41-8 (identifying January 6, 2015, as the date of Baab's first treatment for this "disability").  Baab alleges that his 2015 termination from employment at PMRF "was due to age and disability discrimination and in retaliation for complaining about discrimination."  Compl. ¶ 6, Dkt. No. 1.

*Incidents Pre-Dating Baab's Medical Diagnosis*

Baab's documented difficulties at the PMRF date back to a "County Burn Trailer exercise" on April 24, 2014. Following that exercise, Baab's immediate supervisor, Assistant Fire Chief Oric Kuapahi, "yelled at Lt. Baab for not maintaining proper communications" (Peralta Decl. ¶ 15, Dkt. No. 32-7) and otherwise embarrassed Baab "in front of County Fire and [Baab's] crew" (Baab Letter to DLIR, Dkt. No. 32-11 at 145). *See* Cardejon Decl. ¶¶ 9, 10, Dkt. No. 32-9 (describing Baab's alleged shortcomings during the exercises); Martins Decl. ¶¶ 19, 20, Dkt. No. 32-10 (same). This confrontation, which Baab later identified as the first incident of "bullying" by Kuapahi, caused Baab to feel "really stressed," among other things. Baab Letter to DLIR, Dkt. No. 32-11 at 145; *see also* Odo Decl. 2, Ex. A [Tr. of Baab Depo. (12/8/17) ("Baab Depo.")], Ex. 21 [Annotated Diagram], Dkt. No. 32-11 at 152 (Baab's hand-written notes regarding the April 24, 2014 exercises). Baab claims that he reported Kuapahi's "bullying" behavior to Fire Chief Paul Garrigan upon returning from an extended vacation in September 2014. *See* Baab Letter to DLIR, Dkt. No. 32-11 at 146 (describing his decision to take vacation in July 2014 because he "did not want to participate in" another scheduled "burn trailer session" because of the "stress . . . from the April burn trailer training").

"[A]t least every other week" from October to December 2014, Baab claims that Kuapahi continued to "bully," "harass" and "criticize" him "in front of the entire crew," which was "very stressful," which caused Baab to make "more mistakes," and which made it "difficult for [Baab] to work with [Kuapahi]" moving forward. Baab Letter to DLIR, Dkt. No. 32-11 at 146. Following a communications error Baab admittedly made during a December 19, 2014 "Hazmat Call for the Engine Co.," another non-private confrontation between Kuapahi and Baab allegedly occurred. On December 21, 2014, Kuapahi "scolded [Baab] in front of the shift" and threatened to demote him, which "embarrassed" Baab and "ruined [his] confidence and probably ruined the confidence of [Baab's] men in [him]." Baab Letter to DLIR, Dkt. No. 32-11 at 146–47. Baab again complained to Chief Garrigan. Baab Depo., Ex. 37 [Garrigan–Baab E-mail (12/24/14)], Dkt. No. 32-11 at 169–70. In response, Chief Garrigan reminded Baab that he "occup[ied] a key leadership role in this dept and [would] therefore [be] held to the highest standard." Baab Depo., Ex. 37 [Baab–Garrigan Email (12/31/14)], Dkt. No. 32-11 at 169. At the same time, Garrigan agreed that "the forum in which [Kuapahi addressed Baab's 'fireground shortfalls' was] in question." *Id.* Accordingly, Garrigan met with Kuapahi on December 31, 2014 to "counsel[] Mr. Kuapahi to praise people in public and criticize in private, and [to

inform him] that further infractions would lead to punitive action" against him. Garrigan Decl. ¶ 3, Dkt. No. 32-4.

*Baab's Alleged "Stress" Injury*

On January 1, 2015, Baab responded to a "Power Failure Alarm in Building 384" and "declared command" upon arrival. Baab Depo, Ex. 21 [Annotated Diagram], Dkt. No. 32-11 at 151–52. However, with Kuapahi "towering over [Baab]'s right shoulder," Baab quickly became "frustrated" and had trouble using a key and with remembering the door combination. Annotated Diagram, Dkt. No. 32-11 at 151–52 (stating that he had a "hard time" with this "simple task" "because of pressure to perform"). This led to another confrontation with Kuapahi—this time, in Kuapahi's office—which left Baab "more stress[ed]" than ever. Baab Letter to DLIR, Dkt. No. 32-11 at 147 (stating that he "was torn up inside during [his] next shift Sunday, nerves tearing at [his] stomach and his hands were shaking"). Because Baab "could not remember how to perform simple tasks that were simple for [him] before," given such pressure, and because he "didn't want to put [him]self in danger or [his] crew," he sought advice from Dr. Scheppers, who "proceeded to put [Baab] on Stress Leave to the end of the month." Baab Letter to DLIR, Dkt. No. 32-11 at 148.

Baab thus commenced a medical leave of absence "claiming a stress-related disability" on January 6, 2015. Broyles Decl. ¶ 3, Dkt. No. 32-3. Dr. Scheppers

recommended that Baab remain out "on Disability" until January 27, 2015. *See* Baab Decl., Ex. 8 [Medical Excuse Form (1/6/15)], Dkt. No. 41-9 (certifying that Baab was under Dr. Scheppers' care for "Anxiety as acute reaction to exceptional stress; Stressful job"—arising out of a December 30, 2014 work injury); *see also* Baab Depo., Ex. 34 [Baab–Chief Email (1/9/15)], Dkt. No. 32-11 at 168 (describing the doctor's appointment, diagnosis, and order to remain out of work). Complaining that he had "started to see a Doctor and Physic [sic] Therapist to treat the stress" caused by Kuapahi's alleged "Harassment/Bullying" (Baab Letter to DLIR, Dkt. No. 32-11 at 145–48 (blaming Kuapahi for "the decline and mistakes in [Baab's job] performance")), Baab filed a Charge of Discrimination with the EEOC and the Hawaii Civil Rights Commission ("HCRC") on January 29, 2015 (*cf.* Baab Decl., Ex. 11 [Withdrawal of 1/29/15 EEOC Charge (4/22/15)], Dkt. No. 41-12 (withdrawing EEOC Charge No. 846-2015-12112 "with prejudice")).

Dr. Scheppers subsequently executed another document prescribing another period of medical absence for Baab from February 27, 2015 through April 1, 2015. Baab Decl., Ex. 9 [Medical Excuse Form (3/24/15)], Dkt. No. 41-10 (ordering Baab to return to work on April 2, 2015); *cf.* Broyles Decl. ¶ 3, Dkt. No. 32-3 ("Lt. Baab [was] on leave of absence from January 6, 2015, through April 1, 2015, claiming a stress-related disability."). While out of work, Baab [also] initiated his first Worker's Compensation claim for "Anxiety as acute reaction to exception[al]

stress[;] stressful job," in which he complained that his "[i]nsurance carrier ha[d] not paid benefits." Worker's Comp. Claim (2/27/15), Dkt. No. 41-8 (noting that the "[d]ate of injury should start from 12/21/14" and representing, per Dr. Scheppers, that Baab "will be able to perform usual work" by March 27, 2015). Baab returned to work on April 2, 2015. Broyles Decl. ¶ 5, Dkt No. 32-3.

<em>Baab's Post-Leave Performance Assessments</em>

On April 22, 2015, Baab withdrew his January 29, 2015 Charge of Discrimination and his February 27, 2015 Worker's Compensation Claim pursuant to an agreement with H/E. Baab Decl., Ex. 10 [Stip. for Withdrawal of Worker's Comp. Claim (2/27/15)], Dkt. No. 41-11; Withdrawal of 1/29/15 EEOC Charge (4/22/15), Dkt. No. 41-12. With respect to the Worker's Compensation Claim, the settlement documents note that H/E paid Baab a "monetary consideration" of $1,695.83 "to resolve DCD Case No. 41500085" and further agreed (1) to "allow[] [Baab] to accrue his vacation and sick leave during the period he remained off work on Temporary Disability Insurance, January 6, 2015 – April 1, 2015," (2) to "implement a Work Transitional Plan as well as Performance Improvement Plan" for Baab "no later than June 30, 2015,"[3] and (3) to "provide AC Kuapahi with

---

[3]Baab signed a blank Return-to-Work Transitional Performance Assessment Plan ("TPAP") on April 22, 2015 (Baab Decl., Ex. 12 at 160 [Return to Work TPAP (4/22/15)], Dkt. No. 41-13 at 2), agreeing that the TPAP was "reasonable," in the presence of Chief Garrigan and his Union's attorney, among others (Garrigan Decl. ¶ 4, Dkt. No. 32-4; Baab Depo at 113, Dkt. No. 32-11 at 75).

further management and leadership training . . . in June 2015." Stip. for Withdrawal of Worker's Comp. Claim (2/27/15), Dkt. No. 41-11. In exchange, Baab withdrew his claims and stipulated that the agreement would "forever preclude" a complaint by Baab based on continual harassment/ hostile work environment, including allegations regarding "[o]verall mental stress leading to decline and mistakes in performance, failure to remember how to perform simple tasks, bewilderment, physical illness, insomnia, shaking, loss of appetite, and frequent sore stomach," and those regarding incidents on April 24, 2014, from September–December 2014, and on January 1 and 2, 2015. Stip. for Withdrawal of Worker's Comp. Claim (2/27/15), Dkt. No. 41-11.

In May, June, and July of 2015, Baab "underwent six sections of testing" under the TPAP; "[h]e successfully completed three sections, but failed three other sections." Kuapahi Decl. ¶ 2, Dkt. No. 32-6; Baab Decl., Ex. 12 at 161 [Return-to-Work TPAP (7/7/15)], Dkt. No. 41-13 at 3 (describing Baab's performance). On July 10, 2015, H/E issued Baab a "Final Written Notice/ Warning or Suspension" noting that he failed three of the six "basic task objectives" representing the "fundamental skill requirements" of the Lieutenant position. Baab Depo., Ex. 27 [Emp. Counseling Record], Dkt. No. 32-11 at 163–64.

On August 6, 2015, "Baab's union requested that [H/E] re-evaluate [him] under the TPAP." Kuapahi Decl. ¶ 3, Dkt. No. 32-6. The parties agreed that a

retest would take place on September 17, 2015 and that it "would be the second and final assessment, [so] they would be bound by [its] results[.]" Taylor Decl. ¶ 3, Dkt. No. 32-2; Broyles Decl., Ex. C [Broyles–Parker Mem. (9/24/15)], Dkt. No. 32-13 at 1.

On August 10, 2015, Baab completed an unrelated "Fire Inspection Record that contained seventeen (17) errors," which was apparently Baab's third such record to "contain[] numerous errors." Kuapahi Decl. ¶ 4, Dkt. No. 32-6. As a result of Baab's deficient performance on August 10, 2015, Baab was demoted from his position as "Lieutenant/Crew Chief" to Fire Fighter. Kuapahi Decl. ¶ 5, Dkt. No. 32-6; Taylor Decl., Ex. B [Taylor-Broyles E-mail (9/3/15)], Dkt. No. 32-12 at 3 (stating that Kuapahi "unofficially demoted [Baab] to FF status (apparently [the union attorney] is ok with this), and we are not paying two personnel for LT pay every other shift"). Kuapahi claims that he "did not base [this] decision" on "Baab's age, alleged stress, and/or prior complaints about discrimination." Kuapahi Decl. ¶ 5, Dkt. No. 32-6. Rather, Kuapahi "was concerned about Lt. Baab's ability to lead others" after "receiv[ing] numerous complaints from Fire Fighters working under or alongside Lt. Baab, who" both "reported that they had no confidence in Lt. Baab as their leader," and who "expressed concerns about Lt.

9

Baab's judgment and felt that they were in danger." Kuapahi Decl. ¶ 5, Dkt. No. 32-6.[4]

On August 13, 2015, during a Live Fire Training exercise, Baab once again had difficulties, causing an "emergency all stop" out of "concern[] for Lt. Baab's wellbeing." *See* Suppl. Peralta Decl. ¶ 2, Dkt. No. 32-8 (stating that he stopped the exercise after "notic[ing] that . . . Baab laid on the floor and looked exhausted"); Taylor-Broyles Email (9/3/15), Dkt. No. 32-12 at 3 ("[H]e panicked in the capacity as a FF, not as a leader."). In his own assessment of what happened during the exercise, Baab wrote that after he saw a fellow Fire Fighter, Jason Peralta, open a window to ventilate the room, he "rested against the wall," but "the next moment" noticed that he was "lying face down with the baby[doll to be rescued during the exercise] underneath [him]." Baab Decl., Ex. 15 [Worker's Comp. Claim (12/28/15)] at 3, Dkt. No. 41-16 (alleging that he was not notified that he had lost consciousness inside the burn trailer until the next day). Baab also wrote that after he "got up to [his] feet and walked out" of the exercise trailer, he

---

[4] *See, e.g.*, Martins Decl. ¶¶ 14, 21, Dkt. No. 32-10 (explaining that although Baab was a friend, the Fire Fighters in his crew "do not respect, trust, or have confidence in him as a Crew Chief and fellow firefighter," and note that they "do not always feel safe working with him"); Peralta Decl. ¶¶ 14, 19, Dkt. No. 32-7 (explaining that such "[m]istakes made by firefighters" are concerning because they "can easily result in serious harm or death to the public and/or firefighters themselves"); *accord* Cardejon Decl. ¶ 15, Dkt. No. 32-9; *see also* Kuapahi Mem. (8/10/15), Dkt. No. 41-7 ("[Baab's] lack of meeting the baseline competencies jeopardizes the life safety of crew under [his] leadership. This is a SAFETY ISSUE[.]"); Taylor-Broyles E-mail (9/3/15), Dkt. No. 32-12 at 3 ("The other FFs refuse to work/train with [Baab], and I can't blame them.").

noticed that his "low air bell was sounding off." Worker's Comp. Claim (12/28/15) at 3, Dkt. No. 41-16 (noting that due to his "condition," Baab "provided ventilation instead of making entry again" during the third and final drill). As a result of Baab's performance during the August 13, 2015 live fire drill, Scott Taylor, the Security and Emergency Services Manager overseeing fire and emergency services operations at the PMRF (Taylor Decl. ¶ 1, Dkt. No. 32-2), requested that priority be given to Baab's termination. Taylor–Broyles E-mail (9/3/15), Dkt. No. 32-12 at 3–4 (opining that Baab "is a serious liability to our Fire Dept—someone is going to get hurt sooner or later due to this gentleman's incompetence and lack of mental stability").[5]

On September 17, 2015, Baab "had an opportunity to re-do the three failing areas of his [TPAP]" under Taylor's supervision. Taylor Decl. ¶ 3, Dkt. No. 32-2 (noting that the re-test was also observed by the union's representative, Lieutenant Aaron Amorin, and that Assistant Chief Janis Kiamata and Fire Inspector Patrick Kaneshiro provided technical assistance); *see* Garrigan Decl., Ex. D [Garrigan Summary-of-Concerns Mem. (10/15/15)] ¶ 1(c), Dkt. No. 32-14 (explaining that, in response to Baab's complaints following his first failed TPAP, "[a] second opportunity was provided him to successfully complete these tasks using a

[5]*See* Taylor Decl., Ex. B [Kuapahi–Broyles E-mail (9/4/15)], Dkt. No. 32-12 at 1 (discussing statements he collected from various Fire Fighters regarding the August 13 incident, which he submitted to Human Resources); *e.g.*, Baab Decl., Ex. 12 at 162–63 [Peralta Mem. (RE: 8/13/15 Incident)], 164 [Martins Mem. (RE: 8/13/15 Incident)], Dkt. No. 41-13 at 4–6.

different evaluator" and outside of Kuapahi's presence).[6]  By all accounts, "Baab

did not successfully complete the previously failed sections" during his TPAP

retest.  Taylor Decl. ¶ 4, Dkt. No. 32-2; *e.g.*, Baab Decl., Ex. 12 at 168 [Return-to-

Work TPAP (9/17/15)], Dkt. No. 41-13 at 10; Baab Decl., Ex. 12 at 165–66 [Mem.

for Record (9/17/15)], Dkt. No. 41-13 at 7–8.  As a result, "[H/E] and the Union

agreed that . . . [Baab] should not perform the duties of Lieutenant/Crew Chief due

to the extreme liability at hand for himself, his coworkers, and the company."

Taylor Decl. ¶ 4, Dkt. No. 32-2.  *See also* Broyles–Parker Mem. (9/24/15), Dkt.

No. 32-13 (recommending that H/E terminate Baab "based on his failure to adhere

to performance requirements as well as making poor judgment and decisions that

place[] personnel and company at risk[]").

Baab experienced still further difficulties while acting in his capacity as a

Fire Fighter during a November 16, 2015 "Fire Drill" training exercise involving a

simulated structure fire.  Following this exercise, Chief Garrigan concluded that

Baab was "a threat to safety and urged [his] immediate removal . . . from all Fire

Fighter duties."  Garrigan Decl. ¶ 6, Dkt. No. 32-4.  Garrigan, who had observed

the exercise first-hand, recalled that "Baab appeared extremely anxious and

confused," that Baab's "hands were shaking, and he was breathing rapidly—almost

---

[6]At some point prior to this retest, Baab was also "offered the opportunity to change shifts and supervisor," but "[he] declined."  Garrigan Summary-of-Concerns Mem. (10/15/15), Dkt. No. 32-14; *accord* Baab Depo. at 157–58, Dkt. No. 32-11 at 110–11.

to the point of hyperventilation," and that he "prematurely depleted his oxygen tank due to a 'stress attack.'"  Garrigan Decl. ¶ 6, Dkt. No. 32-4 ("Lt. Baab explained that he was stressed because he wanted to perform well."); *see* Worker's Comp. Claim (12/28/15) at 4, Dkt. No. 41-16 (recalling that, although he "normally . . . would use 20 lbs. of air and not be out of breath, [t]his time [Baab] had 20 lbs left in the bottle and was fighting to catch [his] breath").  Furthermore, Chief Garrigan recalled that "during the training, Lt. Baab's nomex hood slipped down, covering his face mask," and when Baab "did not adjust his hood, but continued to proceed further into the facility," he became "separate[d] from his partner."  Garrigan Decl. ¶ 6, Dkt. No. 32-4 (stating that "[d]ue to Lt. Baab's appearance, [Garrigan] stopped the exercise and directed everyone to leave the facility").  In fact, Baab himself recalled that he had entered the building, "pausing momentarily" at a time when he would normally have acted "without thinking," bec[ame] separated from his partner[,] and "dropped the nozzle" to the fire hose when he noticed his partner was not there.  Worker's Comp. Claim (12/28/15) at 4, Dkt. No. 41-16.  After it was relayed to him the following day that his hands had been shaking when he removed the mask, Baab "got an appointment to see Dr. Scheppers."  Worker's Comp. Claim (12/28/15) at 4, Dkt. No. 41-16.

*Baab's (Final) Medical Leave of Absence & Termination*

When Baab visited Dr. Scheppers on November 17, 2015, his "Blood Press[ure] check was 30 points higher than normal[.]" Worker's Comp. Claim (12/28/15) at 4, Dkt. No. 41-16 (claiming that his blood pressure "never ha[d] been that high"). As a result of this diagnosis, Dr. Scheppers completed a third Medical Excuse Form for Baab, which recommended that Baab remain out of work from November 19 through December 15, 2015, at which time Baab would be medically re-evaluated. Baab Decl., Ex. 13 [Medical Excuse Form (11/19/15)], Dkt. No. 41-14 (reasserting Baab's diagnosis of "Anxiety problem, Stress at Work," and identifying the date of injury as August 13, 2015).

While out of work on this "Medical Leave of Absence," H/E terminated Baab, effective December 11, 2015. *See* Baab Depo, Ex. 10 [Termination Letter (12/15/15)], Dkt. No. 32-11 at 137; *cf.* Broyles Decl. ¶ 7, Dkt. No. 32-3 (stating that Baab "took a leave of absence for stress" on November 17, 2015, and "did not return to work"). The termination was "for cause" because Baab had "failed to adhere to performance requirements as well as exercising poor judgment and making poor decisions that placed personnel and the Company at risk." Termination Letter (12/15/15), Dkt. No. 32-11 at 137 (explaining that "[a]fter several opportunities (assessments), [Baab] failed to demonstrate that [he] w[as] able to perform the requirements of [his] position," and noting that "[t]he second

assessment was conducted at the union's request with the express understanding that if [Baab] did not successfully pass it, [his] employment would be terminated.").  Baab's termination letter also stated that Baab would "be paid for all hours worked through [his] last day" and for any "unused, accrued vacation and paid absence allowance," but his "Employee Benefits (Insurance Plans) w[ould] terminate on December 31, 2015" unless he exercised his option to "continue coverage under COBRA."  Termination Letter (12/15/15), Dkt. No. 32-11 at 137.

*Baab's Post-Termination Grievances*

In a letter dated December 17, 2015, the Department of Labor and Industrial Relations, Disability Compensation Division ("DLIR") informed Baab that his "workers' compensation insurance carrier/employer ha[d] denied liability pending investigation" of Baab's alleged "Body Systems–Stress and Anxiety" injury arising on August 13, 2015.  Baab Decl., Ex. 14 [DLIR Denial of Liability Letter (12/17/15)], Dkt. No. 41-15.  On December 28, 2015, Baab filed a new Worker's Compensation "Stress Claim" related to incidents occurring on August 13 and November 16, 2015.  Worker's Comp. Claim (12/28/15), Dkt. No. 41-16.

On March 16, 2016, Baab also filed a new Charge of Discrimination with the EEOC and HCRC.  Baab Decl., Ex. 1 [Charge of Discrim. (3/16/16)] at 1, Dkt. No. 41-2.  In support of his discrimination allegations, Baab wrote the following:

> C.     . . . .  On or about August 10, 2015, I was demoted from
>        my   managerial   (Lieutenant)   position,   to   regular

Firefighter by Mr. Kuapahi, who claimed I did not have the fundamental skills required of a Lieutenant.

D.    On or about November 17, 2015, I was forced to take another medical (stress) leave of absence due to what I felt was continued retaliatory harassment by Mr. Kuapahi.  To this day, I continue to collect Temporary Disability Insurance benefits.

E.    On or about December 15, 2015, while on stress leave, I was informed that I was being terminated for failing to meet performance requirements, and exercising poor judgment and decision-making that put the company and my co-workers at risk.

F.    I deny any and all wrongdoings, and believe that I was performing my job on a satisfactory level.  To my knowledge, other ex-employees in my age group were similarly treated; they were placed on performance improvement plans then subsequently pushed out of the company.[7]

. . . .

H.    . . . I believe that, but for my age, disability, and/or opposition to discriminatory harassment, I would not have been discharged.

Charge of Discrim. (3/16/16) at 1–2, ¶ II, Dkt. No. 41-2.  Although Baab's union

also "filed a grievance . . . alleging wrongful termination" on February 12, 2016, it

withdrew the grievance on March 31, 2016.  Broyles Decl. ¶ 8, Dkt. No. 32-3.

---

[7] *See* Baab Decl., Ex. 2 [HCRC Interview] at 5, Dkt. No. 41-3 (containing notes from Baab's HCRC "intake interview" on March 3, 2016, which provides further insight into the basis of his age-discrimination allegations).

Baab initiated the instant lawsuit on January 11, 2017 (Compl., Dkt. No. 1),[8]

asserting four causes of action: (I) Disability Discrimination under the Americans

with Disabilities Act of 1990, as amended ("ADA"; Compl. ¶¶ 24–29); (II) Age

Discrimination, in violation of the Age Discrimination in Employment Act of 1967

(Compl. ¶¶ 30–35); (III) Intentional Infliction of Emotional Distress ("IIED";

Compl. ¶¶ 36–39); and (IV) Retaliation, in violation of 42 U.S.C. § 12203 (Compl.

¶¶ 40–42).  In his opposition to H/E's February 7, 2018 MSJ (Dkt. No. 31), Baab

agreed to the dismissal of Counts III (IIED) and IV (Retaliation) with prejudice

and wrote that he would defer to the Court regarding the validity of Count II (Age

Discrimination).  Mem. in Opp'n at 4, Dkt. No. 42.  At the May 4, 2018 hearing on

the MSJ, Baab agreed to the dismissal of Count II, and the parties then stipulated to

the dismissal of all three counts on the record.  *See* Minutes, Dkt. No. 44.  As a

result, the Court only addresses Count I (Disability Discrimination) below.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to

summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."

When a motion for summary judgment is made and adequately supported,

---

[8]Although the record contains no right-to-sue letter from either the EEOC or the HCRC, H/E's
motion does not reference its absence.

the burden shifts to the party opposing summary judgment "to demonstrate the existence of a genuine dispute." *Kowalski v. Mommy Gina Tuna Res.*, 574 F. Supp. 2d 1160, 1162 (D. Haw. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  To meet this burden, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts" and instead must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*, 475 U.S. at 586–87 (citations and internal quotation marks omitted).  For, if no evidence can be mustered to sustain the nonmoving party's position, a trial would be useless. *See Kahumoku v. Titan Mar., LLC*, 486 F. Supp. 2d 1144, 1150 (D. Haw. 2007) (explaining that one of the primary purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## DISCUSSION

In Count I, Baab alleges that he was terminated because of his disability, in violation of the ADA.  Compl. ¶¶ 24–29, Dkt. No. 1.  Baab also argues that, despite informing H/E of his disability, he was denied a reasonable accommodation that would have allowed him to continue to work.  Mem. in Opp'n at 13, Dkt. No. 42.  Because neither contention has merit, the Court GRANTS summary judgment in Defendants' favor on Baab's remaining ADA claim.

# I.     Legal Framework for Disability-Based Disparate Treatment

In employment discrimination cases, "disparate treatment" occurs when a plaintiff is singled out on account of his or her protected characteristic and is treated less favorably than others similarly situated.  The Court applies the burden shifting analysis derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to claims of disability discrimination.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003).  Under this analysis, the plaintiff must first establish a prima facie claim for disability discrimination.  Such a claim requires demonstrating that "(1) he or she is an individual with a 'disability' within the meaning of the statute; (2) he or she is otherwise qualified to perform the essential duties of his or her job with or without reasonable accommodation; and (3) he or she suffered an adverse employment decision because of his or her disability." *French v. Haw. Pizza Hut, Inc.*, 99 P.3d 1046, 1051 (Haw. 2004) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 477–78, 481 (1999), an ADA case, in the context of disability discrimination under HRS § 378-2), *recon. denied*, 101 P.3d 651; *see Hutton v. Elf Atochem N. Am, Inc.*, 273 F.3d 884, 891 (9th Cir. 2001).  If the plaintiff establishes these elements, the employer may then rebut the prima facie case of disability discrimination by articulating a legitimate, nondiscriminatory reason for its adverse employment action.  *Raytheon*, 540 U.S. at 49 n.3.

Assuming, *arguendo*, that Baab has established that he was "disabled" within the meaning of the ADA,[9] he has nonetheless failed to demonstrate that he was "qualified" for the job from which he was terminated. Accordingly, the Court addresses only the second element of Baab's prima facie disability discrimination claim.

## II. Baab Was Not a "Qualified Individual" at the Time of His Termination in December 2015.

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m). As plaintiff, Baab bears the burden of proving that he is "qualified"—by showing (1) that he satisfies the "requisite skill, experience, education and other job-related requirements of the position," and (2) that he "'can perform the essential functions of such position' with or without a reasonable accommodation." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (en banc) (quoting 29 C.F.R. § 1630.2(m); 42 U.S.C. § 12111(8))

---

[9]The Court recognizes that H/E has argued the "disability" element at length. *See, e.g.*, Mem. in Supp. of MSJ at 25–28, Dkt. No. 31-1; Reply at 8–14, Dkt. No. 43. Nonetheless, the Court need not and does not reach this issue in light of the other deficiencies in Baab's disability claims.

(citing, *inter alia*, *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135 (9th Cir. 2001)).

### A. Baab Was Unable to Perform the Essential Functions of His Position at the Time of His Termination.

A job's "essential functions" are the "fundamental job duties of the employment position" not including its "marginal" functions. 29 C.F.R. § 1630.2(n)(1). Although Baab bears the ultimate burden of persuasion on this point, H/E bears the "burden of production . . . to come forward with evidence of those essential functions." *Bates*, 511 F.3d at 990 (citing *EEOC v. Wal-Mart*, 477 F.3d 561, 568 (9th Cir. 2007); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995)). H/E has done so, while Baab has not.

"[R]esponding to emergencies" is indisputably an important function of Baab's former job—both as a Lieutenant/Crew Chief (*see* Baab Depo. at 42–43, 117, Dkt. No. 32-11 at 22–23, 79) and as a Fire Fighter (*see* Baab Depo at 35–38, Dkt. No. 32-11 at 15–18). Moreover, "being able to perform under stress" is an integral component of "responding to emergencies" since stress is inherent in virtually any emergency. Mem. in Supp. at 28, Dkt. No. 31-1. Firefighting is also a profession where "[m]istakes . . . can easily result in serious harm or death to the public and/or firefighters themselves." Peralta Decl. ¶ 14, Dkt. No. 32-7; *accord* Cardejon Decl. ¶ 15, Dkt. No. 32-9; Martins Decl. ¶ 14, Dkt. No. 32-10; Baab

Depo. at 37–38, Dkt. No. 32-11 at 17–18 (confirming under oath that "if one of [his] fellow firefighters didn't perform well during an emergency situation, . . . that [could] be a danger to [Baab's] health and safety" as well as the "health and safety of coworkers" and "members of the public needing [the fire department's] assistance"). As such, Fire Fighters must "be able to function under stress during emergency situations" in order to perform their jobs. Baab Depo. at 37, 43, Dkt. No. 32-11 at 17, 23 (confirming that emergency situations faced by Fire Fighters are "stressful," and "when [Fire Fighters] respond to these situations . . . , [they] need to remain calm . . . . [and] have a clear frame of mind").

Here, there is ample evidence demonstrating that, starting in 2014, Baab's job performance was riddled with mistakes in both emergency and non-emergency situations. *See, e.g.*, Peralta Decl. ¶¶ 16, 18, Dkt. No. 32-7 (Baab "makes the most mistakes of the entire Crew" and is "struggling to keep up with everyone else in the crew"); Martins Decl. ¶¶ 11, 12, Dkt. No. 32-10 (stating that "Baab makes repeated mistakes" and "is often the one in the crew making repeated mistakes")). For instance:

- Baab failed to maintain proper radio communications during a "County Burn Trailer" exercise on April 24, 2014 (*see* Cardejon Decl. ¶¶ 9, 10, Dkt. No. 32-9; Martins Decl. ¶¶ 19, 20, Dkt. No. 32-10);

- Baab failed to follow communication protocols during a December

19, 2014 "Hazmat Call for the Engine Co." (*see* Baab Letter to DLIR,

Dkt. No. 32-11 at 146–47 (admitting to the error)); *see also* Baab

Depo. at 93, Dkt. No. 32-11 at 55 (agreeing that "communications

with fellow firefighters and incident commanders is important"); and

- Baab failed to properly respond to a "Power Failure Alarm in

  Building 384" on January 1, 2015 (Annotated Diagram, Dkt. No. 32-

  11 at 151–52), admitting that, during the exercise, he "could not

  remember how to perform simple tasks that were simple for [him]

  before." Baab Letter to DLIR, Dkt. No. 32-11 at 148 (stating that

  after this, he was motivated to seek medical advice because he "didn't

  want to put [him]self in danger or [his] crew").

The situation did not improve, even after Baab took a three-month medical

leave of absence on doctor's orders. *See* Charge of Discrim. (3/16/16) at 1–2,

¶ II(C), Dkt. No. 41-2. In April 2015, upon his return, Baab agreed to a return-to-

work TPAP that was designed "to evaluate [his] basic duty position skills

(Lieutenant) after return to duty from an extended absence." Emp. Counseling

Record at 1, Dkt. No. 32-11 at 163. Baab himself conceded that the imposition of

the TPAP was "reasonable." *See* Garrigan Decl. ¶ 4, Dkt. No. 32-4; Baab Depo. at

113, Dkt. No. 32-11 at 75. Nevertheless, Baab failed half of the TPAP's

assessments. Return-to-Work TPAP (7/7/15), Dkt. No. 41-13 at 3; *see* Kuapahi

Decl. ¶ 2, Dkt. No. 32-6.  As a result, H/E issued Baab a "Final Written Notice/ Warning or Suspension" on July 10, 2015, which specified that Baab's "fail[ure] [of] three (3) of the six (6) performance objectives . . . jeopardizes the life-safety of crews under [Baab's] leadership," and which warned that any future "[f]ailure to perform competently at the Lt level . . . may result in further action up to . . . termination of employment."  Emp. Counseling Record, Dkt. No. 32-11 at 163–64.

Despite H/E's warnings, Baab's inability to perform did not improve.  Just one month later, in August 2015, Baab completed a Fire Inspection Record containing seventeen errors, which had become something of the norm for him. Kuapahi Decl. ¶ 4, Dkt. No. 32-6 (noting that this was Baab's third Fire Inspection Record to "contain[] numerous errors").  A few days later, Baab "panicked" during an August 13, 2015 Live Fire Training Exercise, forcing supervisory personnel to prematurely end the exercise on an emergent basis due to "concern[] for Lt. Baab's wellbeing."  Suppl. Peralta Decl. ¶ 2, Dkt. No. 32-8; Taylor–Broyles E-mail (9/3/15), Dkt. No. 32-12 at 3.

Baab's failures, moreover, cannot be attributed to his some-time belief that Assistant Chief Kuapahi had it out for him.  His repeated failures were witnessed and supervised by many others, including Fire Chief Garrigan, Assistant Chief Kiamata, Fire Inspector Kaneshiro, Emergency Services Manager Taylor, and Baab's union representatives.  Taylor Decl. ¶ 3, Dkt. No. 32-2.  In fact, Baab failed

his second TPAP on September 17, 2015 when being assessed by an evaluator other than Kuapahi, his direct supervisor. *See* Taylor Decl. ¶ 3, Dkt. No. 32-2; Garrigan Summary-of-Concerns Mem. (10/15/15) ¶ 1(c), Dkt. No. 32-14; *e.g.*, Return-to-Work TPAP (9/17/15), Dkt. No. 41-13 at 10; Mem. for Record (9/17/15), Dkt. No. 41-13 at 7–8 (describing Baab's deficiencies on both minor and major tasks, including his "failure to address a very unsafe condition with a fire fighter applying a knot around only one side of the axe head during hoist, which resulted in the axe nearly falling during ascent"). Similarly, Baab failed a November 16, 2015 Fire Drill training exercise involving a simulated structure fire when he "prematurely depleted his oxygen tank due to a 'stress attack,'" forcing the exercise to be stopped by evaluators other than Kuapahi due to Baab's "extremely anxious and confused" state. Garrigan Decl. ¶ 6, Dkt. No. 32-4.

Given this record, it is hardly surprising that Fire Fighters in Baab's crew reported that they "d[id] not always feel safe working with him" (Martins Decl. ¶ 21, Dkt. No. 32-10; *accord* Peralta Decl. ¶ 19, Dkt. No. 32-7; *see* Kuapahi Decl. ¶ 5, Dkt. No. 32-6), and that those in charge would be moved to call for Baab's termination in the name of safety (Broyles–Parker Mem. (9/24/15), Dkt. No. 32-13 (seeking Baab's termination "based on his . . . decisions that . . . compromise personnel safety and put[] personnel at risk"); Taylor–Broyles E-mail (9/3/15), Dkt. No. 32-12 at 3; Garrigan Decl. ¶ 6, Dkt. No. 32-4 (stating after the November

16, 2015 incident that he "considered Lt. Baab to be a threat to safety and urged the immediate removal of him from all Fire Fighter duties")). As the letter informing Baab of his termination clearly stated: "The second [TPAP] assessment was conducted at the union's request with the express understanding that if you did not successfully pass it, your employment would be terminated." Termination Letter (12/15/15), Dkt. No. 32-11 at 137. Baab did not successfully pass it. And he was terminated.

The Court concludes that, at the time of his December 2015 termination, Baab was unable to perform the essential functions of his job as a Fire Fighter at PMRF.

## B. Baab's Requested Accommodations Would Have Still Left Him Unable to Perform the Essential Functions of His Position.

"An employer discriminates against a qualified individual with a disability by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Creamer v. Cty. of Kauai*, 2017 WL 5904634, *5 (D. Haw. Nov. 30, 2017) (quoting *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)) (internal quotation marks omitted) (additional citations omitted). In the Ninth Circuit, although "medical leave" may be a reasonable

accommodation under the ADA, Baab, as plaintiff, carries the burden of establishing it. *Dark v. Curry Cty.*, 451 F.3d 1078, 1090 (9th Cir. 2006) (citing *Nunes*, 164 F.3d at 1247); *Schwartz v. City & Cty. of Honolulu*, 2017 WL 701357, at *11 (citing *Dark*, 451 F.3d at 1088; *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999)).

Here, the very "accommodation" that Baab argues would have been "reasonable" was a further period of extended medical leave from work. *See* Mem. in Opp'n at 13, Dkt. No. 42. That is, although Baab acknowledges that H/E authorized his three-month leave of absence in early 2015 (Compl. ¶ 14, Dkt. No. 1; Mem. in Opp'n at 4, Dkt. No. 42 (citing Baab Decl. ¶ 11, Dkt. No. 41-1)), he clarified during the May 4, 2018 summary judgment hearing that he believes he was denied a reasonable accommodation because H/E declined to permit a second period of leave beginning in mid-November 2015 (*see* Medical Excuse Form (11/19/15)], Dkt. No. 41-14 (instructing Baab to "[s]tay home from work 11/19/15 through and including 12/18/15," and to "[r]eturn for follow up visit on: 12/18/15")).

"[I]rregular attendance[, however,] compromises essential job functions" in occupations such as firefighting. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (citations omitted) (explaining that "[a]n employer need not provide accommodations that compromise performance quality,"

particularly in a first responder setting, where requiring a fire department to do so could, "quite literally, be fatal"); *accord Schwartz v. City & Cty. of Honolulu*, 2017 WL 701357, *10 (D. Haw. Feb. 22, 2017) (citing *Samper*, *supra*; *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 35 (1st Cir. 2011); *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 322 (6th Cir. 2012); *Basden v. Prof'l Transp. Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013)), *appeal dismissed*, 2018 WL 1586050 (9th Cir. Jan. 8, 2018).

Moreover, Baab has not demonstrated that he would have been able to perform the essential functions of his job if he had been provided the "reasonable accommodation" of another extended period of medical leave beginning on November 15, 2015. *See* Mem. in Opp'n at 13, Dkt. No. 42; *e.g.*, Baab Depo. at 151–52, Dkt. No. 32-11 at 105–06 (noting that it took "about a year after [his] employment [before he] started feeling normal"). The evidence, in fact, demonstrates otherwise. As discussed above, even after H/E permitted Baab to take a three-month leave of absence in early 2015 to address what his physician referred to as acute stress, Baab returned and fared no better. Why he thinks a second leave opportunity would have achieved a different result is not evident.[10]

---

[10]During discovery, Baab identified two other "accommodations" that he felt would have been reasonable for H/E to implement: transfer to a different supervisor (other than Assistant Chief Kuapahi) and exemption from performance testing. Baab Depo. at 157–58, Dkt. No. 32-11 at 110–11. Based on counsel's representations at the May 4 hearing, it appears that Baab has abandoned both contentions. For good reason. First, the record reflects that Baab *was* offered a transfer to a different supervisor, but declined. *See, id.* (confirming that he declined an offer to

## III. H/E Has Provided a Legitimate, Non-Discriminatory Reason for its Decision to Terminate Baab.

H/E has provided substantial evidence regarding its legitimate business reason for Baab's termination—*i.e.*, Baab's repeated failures to perform the essential duties of his job as a Fire Fighter, which jeopardized the safety of all concerned. *See, e.g.*, Broyles–Parker Mem. (9/24/15), Dkt. No. 32-13 (seeking Baab's termination "based on his . . . decisions that place[] personnel and company at risks [sic]"); Garrigan Decl. ¶ 6, Dkt. No. 32-4 (stating, after observing Baab's performance during a "'simulated' structure fire" training exercise on November 16, 2015, he "considered Lt. Baab to be a threat to safety and urged the immediate removal of him from all Fire Fighter duties"); Taylor–Broyles E-mail (9/3/15), Dkt. No. 32-12 at 3 (opining, based in part on Baab's performance during the August 13, 2015 Live Fire Drill, that Baab "is a serious liability to our Fire Dept— someone is going to get hurt sooner or later due to this gentleman's incompetence

---

transfer to another supervisor after returning from his first leave of absence); Garrigan Summary-of-Concerns Mem. (10/15/15), Dkt. No. 32-14 (noting that Baab was "offered the opportunity to change shifts and supervisor" after complaining of hostility by Kuapahi, but "[Baab] declined"). Second, a personal exemption from performance testing is fanciful, not reasonable.  No member of the public would want a Fire Fighter on staff whose abilities could not be battle-tested under emergent conditions, rendering Baab's suggestion that H/E agree not to test him a non-starter. *See Samper*, 675 F.3d at 1241; Kuapahi Decl. ¶ 5, Dkt. No. 32-6; *e.g.*, Peralta Decl. ¶ 16, 18–19, Dkt. No. 32-7; Martins Decl. ¶¶ 11, 12, 21, Dkt. No. 32-10.

and lack of mental stability"); Termination Letter (12/15/15), Dkt. No. 32-11 at 137 ("You failed to adhere to performance requirements" and exercised "poor judgment . . . that placed personnel and the Company at risk.").  Moreover, H/E has provided evidence that Baab's disability played no part in its termination decision.  *E.g.*, Taylor Decl. ¶ 5, Dkt. No. 32-2 (confirming that H/E "did not base [its]" decision to terminate Baab "on [his] age, alleged stress, or prior complaints of discrimination"); Garrigan Decl. ¶ 7, Dkt. No. 32-4 (same); Kuapahi Decl. ¶ 6, Dkt. No. 32-6 (same); *see* Parker Decl. ¶ 4, Dkt. No. 32-5 (stating that Parker is "not aware of any decision makers basing their decision" to terminate Baab on anything other than his failure to perform).  Baab has not provided any evidence of pretext that would undermine this evidence.  *Cf.* Baab Depo. at 179–82, Dkt. No. 32-11 at 127–30 (claiming that Chief Garrigan stated in the summer of 2015 that "[h]e didn't believe . . . that somebody could be stress disabled" and stating that Taylor told Baab, "I know you're going to be under stress, but try to be calm," prior to Baab's second round of TPAP testing, but confirming that no other managers ever made comments to him based on disability or stress).  *See Raytheon*, 540 U.S. at 49 n.3 (explaining that, when a defendant provides a non-discriminatory reason for its employment decision, a plaintiff can only prevail if he or she demonstrates that the offered reason was pretext, and that intentional discrimination was the true reason for the adverse employment action).

Accordingly, Baab's disability discrimination claim fails under *McDonnell Douglas*, 411 U.S. 792.

## CONCLUSION

There comes a time in every first responder's career when skills erode, reflexes slow, and the ability to perform like one may have been able to do in the past simply is not there. When these eventualities occur, it is incumbent on that responder to step aside. Personal safety demands it. The safety of one's co-workers demands it. The safety of the public demands it. For Baab, that time is now.

The Court hereby GRANTS Defendants' Motion for Summary Judgment (Dkt. No. 31).

IT IS SO ORDERED.

DATED: June 12, 2018 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge